IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRELL A. CONNOR, Individually and as )
Executrix of the Estate of CHARLES FRANKLIN )
CONNOR, Deceased, )
)
Plaintiff, )
)
v. ) 1:17CV127
)
NORFOLK SOUTHERN RAILWAY COMPANY, )
et al. )
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff, individually and as executrix of the estate of Charles Franklin Connor, initiated this wrongful death action. (ECF No. 98.) Before the Court are the following motions: (i) Motion for Summary Judgment, filed by Defendant Covil Corporation ("Covil"), (ECF No. 193); (ii) Defendant Daniel International Corporation's ("Daniel International") Motion for Summary Judgment, (ECF No. 195); and (iii) two *Daubert*[1] motions, filed by Covil and Daniel International, to exclude the causation testimony of Plaintiff's experts, Edwin Holstein, M.D., Brent Staggs, M.D., and Arnold Brody, Ph.D., (ECF Nos. 201, 202).[2] For the

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] Plaintiff originally named a number of defendants in this action, all of which have either settled with Plaintiff or have been dismissed, except Covil Corporation and Daniel International Corporation. On December 7, 2018, counsel for Plaintiff notified the Court of settlement as to Defendant Norfolk Southern Railway Co. (*See* 12/7/2018 Docket Entry Text.) Therefore, the Court will only address the motions filed by Covil and Daniel International.

reasons set forth below, the Court will grant the summary judgment motions filed by Covil and Daniel International, and the remaining motions will be denied as moot.

## I. BACKGROUND

Charles Franklin Connor ("Mr. Connor") was diagnosed with mesothelioma on October 12, 2016 and died on June 11, 2017. (ECF No. 98 ¶¶ 2, 32, 33; ECF No. 208-3 at 17, 22.) The Complaint[3] alleges, in relevant part, that Mr. Connor was "exposed to various asbestos-containing products while employed at Fiber Industries (a/k/a/ Hoechst Celanese) in Salisbury, North Carolina from approximately 1966 until 1982." (ECF No. 98 ¶¶ 2, 38.) According to the Complaint, over the course of his employment at Fiber Industries, Mr. Connor "worked with, or in close proximity to others who worked with, asbestos-containing materials including but not limited to asbestos pipe covering, gaskets, turbines, boilers, and other asbestos-containing materials." (*Id.* ¶ 2.)

The Complaint alleges the following five causes of action against Daniel International, which built the Fiber Industries facility, (ECF No. 194-6 at 6), and Covil, which supplied insulation to Daniel International, (*see* ECF No. 208-5 at 33, 38): (i) negligent failure to warn—defective design, (ECF No. 98 ¶¶ 49–69); (ii) breach of implied warranty, (*id.* ¶¶ 70–74); (iii) gross negligence—willful, wanton, and reckless conduct, (*id.* ¶¶ 75–83); (iv) failure to warn, (*id.* ¶¶ 84–89); and (v) premises liability, negligence, gross negligence, and malice, (*id.* ¶¶ 90–98). Plaintiff's Complaint also includes a claim for punitive damages. (*Id.* ¶¶ 104–109.) Covil

---

[3] References to the "Complaint" refer to the First Amended Civil Action Complaint, (ECF No. 98), which is the operative complaint.

and Daniel International each move for summary judgment against Plaintiff on causation grounds. (*See* ECF Nos. 193, 195.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When reviewing a motion for summary judgment, the court must view the evidence and "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

In cases where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) (emphasis omitted)). In so doing, "the nonmoving party must rely on more than

conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). The nonmoving party must support its assertions by citing to particular parts of the record, or by showing that the materials cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. The judicial inquiry on summary judgment "thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## III. DISCUSSION

Covil argues that it is entitled to summary judgment on all claims because "Plaintiff cannot prove the essential element of causation to support his claims against Covil." (ECF No. 194 at 12.) Covil contends that "Plaintiff has failed to present evidence that Mr. Connor was exposed to any asbestos-containing product for which Covil was legally responsible, much less that Mr. Connor had frequent, regular, and proximate exposure to such products." (*Id.* at 14–15.) Similarly, Daniel International moves for summary judgment against Plaintiff "on the ground that there is insufficient evidence that it exposed Mr. Connor to asbestos" under the frequency, regularity, and proximity test set forth in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986). (ECF No. 195 at 1.) In response to each motion, Plaintiff argues that he has provided sufficient evidence of the frequency, regularity, and proximity of Mr. Connor's exposure to asbestos insulation supplied by Covil, and installed and removed by Daniel International, at Fiber Industries to demonstrate actual exposure. (ECF No. 207 at 21; ECF No. 208 at 17.) Plaintiff further argues that based on the evidence, "a jury [would]

4

conclude that this exposure was a substantial factor in causing [Mr. Connor's] disease." (ECF No. 207 at 21; ECF No. 208 at 17.)[4]

A.  **North Carolina Law of Causation in Asbestos Cases**

Under North Carolina law, a plaintiff bringing an action arising from asbestos exposure must forecast evidence showing actual exposure to the alleged offending products to survive summary judgment. *Wilder v. Amatex Corp.*, 336 S.E.2d 66, 67–68 (N.C. 1985). The Fourth Circuit has concluded that North Carolina law requires "the plaintiff in a personal injury asbestos case '[to] prove more than a casual or minimum contact with the product' containing asbestos in order to hold [the defendant] liable." *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 & n.2 (4th Cir. 1995) (quoting *Lohrmann*, 782 F.2d at 1162)). Rather, a plaintiff in such a case must satisfy the "frequency, regularity and proximity" test, which requires the plaintiff to introduce "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Lohrmann*, 782 F.2d at 1162–63 (holding evidence of exposure to an asbestos-containing product "on ten to fifteen occasions of between one and eight hours duration" insufficient to hold the product's manufacturer liable). *See also Pace v. Air & Liquid Sys. Corp.*, 642 F. App'x 244, 247 (4th Cir. 2016) (terming the above-described test adopted in *Lohrmann* the "frequency, regularity, and proximity" test").[5]

---

[4] Plaintiff states, in a footnote in his response to Covil's motion, that he "is not opposing partial summary judgment on [his] claims for premises liability and design defect." (ECF No. 208 at 2 n.2.)

[5] Plaintiff appears to argue that a different causation standard applies in cases involving mesothelioma present. (ECF No. 207 at 14–18; 208 at 14–16.) Plaintiff contends that "courts that have applied the *Lohrmann* test in mesothelioma cases have found that relatively brief exposures are sufficient to satisfy the *Lohrmann* factors." (ECF No. 207 at 16; ECF No. 208 at 15.) In support of this assertion, Plaintiff cites a number of state and circuit court cases. (*See* ECF No. 207 at 16–17 (citing cases); ECF No.

## B. Evidence Relevant to Motions for Summary Judgment filed by Covil and Daniel International

The evidence in the record shows that, in 1965, Daniel International built Fiber Industries, a polyester production plant in Salisbury, North Carolina. (ECF No. 194-6 at 6; ECF No. 208-3 at 7–8.) Fiber Industries was a "large plant," spanning approximately 20 acres and employing over 1,000 people. (ECF No. 208-3 at 7.) The facility was comprised of several buildings including a multi-level main building which housed, among other things, the facility's main production plant. (*See* ECF No. 208-2 at 4, 14–16, 22.)

Daniel International "had a contract to buy [insulation] through Covil," which, at the time, served as its main supplier of insulation. (ECF No. 208-5 at 38; *see* ECF No. 208-7 at 25; ECF No. 208-9 at 55; ECF No. 208-10 at 2–45.) During construction, Daniel International and its subcontractors installed insulation throughout the Fiber Industries facility. (ECF No. 208-7 at 7, 21.) Some of the insulation installed throughout the facility—particularly insulation for "high-temperature piping"—contained asbestos. (*See* ECF No. 208-7 at 6.) Other types of insulation, including "fiberglass insulation, cork, [and] rubber," were also installed throughout the facility. (ECF No. 208-2 at 21.)

---

208 at 15 (citing cases).) None of these cases cited by Plaintiff, however, were decided by North Carolina state courts; nor were any of the cases cited decided by North Carolina federal courts or the Fourth Circuit interpreting North Carolina law. In fact, federal courts in North Carolina have routinely applied *Lohrmann*'s "frequency, regularity, and proximity" test to evaluate proximate causation in asbestos cases, including those involving mesothelioma, arising under North Carolina law. *See, e.g., Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 4101828, at *1, *4 (M.D.N.C. Aug. 22, 2018); *Starnes v. A.O. Smith Corp.*, No. 1:12–CV–360–MR–DLH, 2014 WL 4744782, at *1, *3 (W.D.N.C. Sept. 23, 2014); *Logan v. Air Prods. & Chems., Inc.*, No. 1:12-CV-1353, 2014 WL 3891366, at *2, *4–*5 (M.D.N.C. Aug. 7, 2014). Thus, the Court finds no merit in Plaintiff's argument that, in cases involving mesothelioma, it should apply a different or less onerous causation standard than that articulated in *Lohrmann*.

Following construction of the facility, many Daniel International employees remained on-site to perform ongoing maintenance and repair tasks throughout the facility. (*See* ECF No. 194-6 at 6; ECF No. 208-6 ¶ 13.) Among their tasks, Daniel International employees routinely removed and replaced asbestos insulation from piping and other equipment. (ECF No. 208-6 ¶¶ 22–23.) To do so,

> Daniel [International] insulators would tear the old insulation off of the pipes by using hammers and saws to knock and break it off. The old insulation would crack, break apart, crumble and fall to the floor, spreading dust. . . . The dust would float out across the work areas of the plant. Sometimes there was tape, wood or polyethylene used to separate off the Daniel [International] work areas but it did not always block the dust.

(ECF No. 208-6 ¶ 23; *see* ECF No. 208-5 at 40.)

### C. Covil's Motion for Summary Judgment

In support of its motion, Covil first argues that "there is no evidence that [asbestos-containing] products [at Fiber Industries] were provided by Covil." (ECF No. 194 at 16.) The Court disagrees. As stated above, the record reflects that Covil supplied asbestos-containing insulation to Daniel International which was installed at Fiber Industries, at least from 1965 to 1973. Specifically, invoices dated 1965 through 1971 show that Covil sent shipments of insulation material which were addressed to Daniel International, "c/o Fiber Industries." (*See* ECF No. 208-10 at 2–45.) In addition, Jerry Hicks, a Daniel International employee from 1964–1979, testified that, in his role as a general foreman at the Fiber Industries facility, he

7

ordered[6] insulation material from Covil because Daniel International "had a contract to buy [insulation] through Covil." (ECF No. 208-5 at 7, 31–32, 38, 72.) Mr. Hicks further testified that some of the insulation was packaged in boxes which bore labels stating: "This product contains asbestos." (*Id.* at 34.) Daniel International ended its practice of purchasing asbestos-containing insulation in 1973, yet its employees were permitted "to use up what [asbestos insulation they] had on hand" until 1975.[7] (*Id.* at 35–36; *see* ECF No. 208-7 at 48.) In 1975, Daniel International ceased all installation of asbestos-containing insulation at Fiber Industries. (ECF No. 208-5 at 36–37.) This evidence thus establishes that Covil provided asbestos-containing insulation which was used at Fiber Industries, at least from 1965–1973.

The Court further finds, however, that there is insufficient evidence from which a jury could find that Mr. Connor was exposed to asbestos fibers from Covil-supplied insulation on a frequent and regular basis in close proximity to where he worked. Plaintiff argues that Mr. Connor "was exposed to asbestos insulation supplied by Covil for Daniel [International's] use at Fiber Industries." (ECF No. 208 at 17.) Specifically, Plaintiff contends that Mr. Connor "was in areas of the plant where Daniel [International] was working with asbestos insulation," and that Mr. Connor "continued to experience exposure to Covil-supplied insulation every time it was removed thereafter." (ECF No. 208 at 16, 17.) Indeed, a bystander may maintain a cause of action for asbestos exposure where the evidence, albeit circumstantial, shows

---

[6] Mr. Hicks testified that "either [h]e or somebody that was working for [him]" ordered insulation on behalf of Daniel International for use and storage at the Fiber Industries facility. (ECF No. 208-5 at 32.)

[7] Daniel International employees stored the insulation that had been ordered "on the mezzanine floor," in a "big area" at Fiber Industries. (ECF No. 208-5 at 33.)

8

"proximate and significant" exposure. *Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 4101828, at *4 (M.D.N.C. Aug. 22, 2018) (citing *Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir. 1986)). The record in this case, however, fails to sufficiently demonstrate any such exposure.

As evidence of Mr. Connor's actual asbestos exposure, Plaintiff relies on his deposition testimony, as well as the deposition testimony of Mr. Connor and Troy Witherspoon ("Witherspoon"). (*See* ECF No. 208 at 2–4.) As previously stated, Mr. Connor was employed at Fiber Industries from 1966 to 1982. (ECF No. 194-3 at 19.) He was initially hired to work in production in the beaming department.[8] (*Id.*) Approximately four or five months thereafter, Mr. Connor was promoted to training and development supervisor, a position he held for most of his 16-year tenure at Fiber Industries. (ECF No. 194-3 at 19; ECF No. 208-1 at 13–14, 28.)

Mr. Connor's office at Fiber Industries was located in "a separate building," known as the P building, which was approximately 200 feet from the facility's main production building. (ECF No. 208-1 at 14; ECF No. 208-2 at 14–15; *see also* ECF No. 194-4 at 10, 12.) Mr. Connor testified that although he spent most of his time in the P building, (ECF No. 208-1 at 28), he would regularly walk throughout the plant to monitor the training operators and other employees whom he supervised. (*Id.* at 14, 28; ECF No. 208-3 at 14–15.)

With respect to his daily schedule, Mr. Connor testified that he would routinely report to his office in the P building when he arrived at work and "follow[ ] up on some paperwork."

---

[8] "The beaming department is where the synthetic fibers were wound onto large 'beams' or spools for shipment" for use in products, such as tire cords. (ECF No. 194-3 at 19; *see also* ECF No. 194-4 at 4.)

(ECF No. 208-1 at 29.) He would then "get out in the [plant to] see what [was] going on." (*Id.*) Mr. Connor testified that some days he "would make a couple passes . . . through the area," while other days he would not do so, as "[i]t's a pretty big plant." (*Id.*)

Further, with respect to Daniel International's repair work performed throughout the facility, Mr. Connor testified as follows:

> Q. Now, so you would give Daniel crews permission to do . . . repair work. And . . . did you watch Daniel [employees] do that work or did you move on?
>
> A. No. Well, I would see back and forth, you know, because like I said, it is a pretty wide—big area. So I would see them several times a day. But no, I didn't stand and watch them.

(*Id.*) In addition, when discussing his knowledge of the presence of asbestos in his work area at Fiber Industries, Mr. Connor's testimony is as follows:

> Q. . . . Did you ever work in an area where you had asbestos, where you were wearing one of these masks, to your knowledge?
>
> A. No. No, I didn't have to because I was in the training department for the last 16 and a half years. And training, it was just as clean as your home.

(*Id.* at 35.) This testimony undermines Plaintiff's claims that Mr. Connor was actually exposed to asbestos during Daniel International's work with Covil-supplied asbestos insulation at Fiber Industries.

Next, as to Witherspoon's deposition testimony regarding Mr. Connor's asbestos exposure, the Court finds this evidence speculative, at best. Witherspoon was employed at Fiber Industries from 1968 to 1982. (ECF No. 208-2 at 4.) He began his career at Fiber Industries as a production worker in the filament department before becoming a training

10

instructor in 1970, at which time he met Mr. Connor. (*Id.* at 3–4.) Witherspoon testified that, although he worked in a different department, he saw Mr. Connor "virtually every day, Monday through Friday." (*Id.* at 4.)

When asked whether Mr. Connor was "around Daniel [International]'s employees who were removing and installing insulation material between 1970 and 1982," Witherspoon responded:

> I think so. . . . I think it's something both of us *would have been* out in the area at the same time and did see them doing this. . . . It *would have been* impossible for [Mr. Connor] to do his job without being out in the [main production] area. . . . He *would have had to have been* in the area.

(ECF No. 208-2 at 7–8 (emphasis added).) Elsewhere in Witherspoon's deposition, he attempts to provide more definitive testimony about having observed Mr. Connor "once to three times a week" within a couple feet of where Daniel International's employees were working. (*Id.* at 7.) However, when pressed, Witherspoon admits that his recollection of Mr. Connor's whereabouts in the facility during that period is based on his (Witherspoon's) experience performing a job function similar to that of Mr. Connor.

> Q. [I]s your statement here about [Mr. Connor] being around Daniel insulators . . . based on your experience doing a similar type of job?
>
> A. Yes.

(*Id.* at 7.)

In addition, when asked whether Mr. Connor "actually supervised the actual maintenance work that the Daniel [International] folks were doing," Witherspoon responded: "No. As far as . . . supervising them, no, because they didn't work for him." (*Id.* at 20.)

11

Witherspoon also testified that he was aware that the facility contained both asbestos and asbestos-free insulation, and he further admitted that he was unable to discern the difference "simply by looking at some [employee]" working with the insulation. (*Id.* at 21.)

Witherspoon did testify that Mr. Connor "observed" Daniel International employees "to ensure that his product was being produced," yet he could not provide any details specific to Mr. Connor, stating: "I can't give you a specific time, day, or nothing like that. . . . It could have been in any of the buildings." (*Id.* at 20.) Such testimony by Witherspoon is simply too vague and speculative to satisfy Plaintiff's burden of demonstrating that Mr. Connor was actually exposed to Covil-supplied asbestos insulation used by Daniel International employees. *See Pace*, 642 F. App'x at 249 (finding the testimony of decedent's coworker that decedent worked on defendant's asbestos-laden pumps "a lot" to be speculative); *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 315 n.3 (4th Cir. 2001) (holding "vague" deposition testimony "insufficient to create a genuine issue of material fact").

Plaintiff also cites his own deposition testimony as evidence of Mr. Connor's actual asbestos exposure. (*See* ECF No. 208 at 4.) Plaintiff is Mr. Connor's eldest son, and he was employed at Fiber Industries from 1968–1974. (ECF No. 208-3 at 3, 5.) Plaintiff argues that his testimony establishes that Mr. Connor's "responsibilities as a trainer took him to every part of the plant," (ECF No. 208 at 4.) Indeed, Plaintiff testified that he would see his father at "[d]ifferent places" in the facility—sometimes in Mr. Connor's office and, other times, as he was walking down the facility's hallways. (ECF No. 208-3 at 14, 15.) Yet, his testimony included no information about having observed Mr. Connor around Daniel International employees as they removed and installed insulation material which may have contained

12

asbestos. Further, when asked whether he ever saw his father in a situation where he believed his father "was being exposed to asbestos at the plant," Plaintiff responded: "I don't know that." (*Id.* at 15.)

Plaintiff also cites the deposition testimony of Daniel International employees Gary Albright, Jerry Lee Hicks, and Paul Ogburn to establish that Daniel International employees were exposed to asbestos at Fiber Industries. (ECF No. 208 at 4–7.) While such evidence may establish that Daniel International employees who were responsible for installing, repairing, and replacing insulation may have, themselves, been exposed to asbestos, it does not, however, demonstrate that Mr. Connor—who was not responsible for handling insulation, and whose office where he spent most of his time was located in a separate building, approximately 200 feet from the main production plant—was routinely present during Daniel International employees' handling of Covil-supplied asbestos insulation.

Plaintiff nonetheless argues that his "evidence shows that [Mr. Connor] was in areas of the plant where Daniel [International] was working with asbestos insulation," and it has therefore satisfied the *Lohrmann* test. (ECF No. 208 at 16–17.) Plaintiff seemingly misapprehends its burden under *Lohrmann*. As articulated by the Fourth Circuit in *Lohrmann*, "the mere proof that the plaintiff and a certain asbestos product are at the [same location] at the same time, without more, does not prove exposure to that product." 782 F.2d at 1162.

Plaintiff also argues that "[t]he circumstantial evidence in this case is remarkably similar to" that in the following circuit court opinions: *Jones v. Owens-Corning Fiberglass Corp.*, 69 F.3d 712 (4th Cir. 1995), *Roehling v. National Gypsum Co. Gold Bond Building Products*, 786 F.2d 1225 (4th Cir. 1986), and *Slaughter v. Southern Talc Co.*, 949 F.2d 167 (5th Cir. 1991). (ECF No. 208

13

at 16.) In each of those cases the court found sufficient evidence of causation under *Lohrmann*. *See, e.g., Jones*, 69 F.3d at 716 (affirming district court's entry of summary judgment against an asbestos manufacturer where the record "consist[ed] of direct evidence that establishe[d] that [plaintiffs] were exposed to asbestos dust on a daily basis, and more specifically to [the asbestos containing products] on a regular basis, for approximately 20 years" (internal quotation marks omitted)); *Slaughter*, 949 F.2d at 170, 171, 173 (finding circumstantial proof of plaintiffs' exposure sufficient to withstand summary judgment in favor of manufacturer where the evidence showed, in part, that pipe insulation was removed and replaced throughout the plant on a daily basis; that insulation dust would regularly cover the workers in the area when pipe insulation was repaired; and that the plant "was a very dirty place to be"; *Roehling*, 786 F.2d at 1228 (finding sufficient evidence that the bystander plaintiff "was exposed to defendants' [asbestos-containing] products" where the evidence showed that the plaintiff "worked in the same limited area of the plant, at the same time, as the witnesses" who handled asbestos-containing materials). Unlike the evidence in those cases, the record here does not establish that Mr. Connor was exposed to asbestos dust on a regular basis over a period of time, nor that Mr. Connor regularly worked in a limited area near the Daniel International employees who routinely installed, removed and repaired asbestos-containing insulation. In fact, as set forth above, although Mr. Connor would, at times, pass through different areas of the plant, (ECF No. 208-1 at 29), he spent most of his time in the P building where his office was located, (*id.* at 28). Further, according to Mr. Connor, his training department "was just as clean as your home." (*Id.* at 35.)

In sum, the evidence, viewed in the light most favorable to Plaintiff, fails to establish that Mr. Connor was actually exposed to asbestos-containing insulation supplied by Covil "on a regular basis over some extended period of time in proximity to where [he] actually worked." *Lohrmann*, 782 F.2d at 1162–63. The Court, therefore, concludes that Plaintiff's evidence is insufficient to support an inference that Mr. Connor's harm was caused by asbestos insulation supplied by Covil. Accordingly, Covil is entitled to judgment as a matter of law on all of Plaintiff's claims against it.

### D.  Daniel International's Motion for Summary Judgment

Daniel International argues that the evidence fails to establish causation. (ECF No. 195 at 1.) Specifically, Daniel International contends that "Mr. Connor himself was unable to affirmatively state that he was actually exposed to asbestos by Daniel [International]," and further, that "the co-worker testimony is insufficient to establish exposure to asbestos from Daniel [International] with the sufficient frequency, regularity, and proximity." (ECF No. 196 at 10 (internal quotation marks).)

As with his response to Covil's causation argument, here, Plaintiff likewise points to the co-worker testimony of Witherspoon, as well as his own testimony. (ECF No. 207 at 2-4.) Plaintiff argues that "Witherspoon establishes that [Mr. Connor] was around Daniel [International] insulators as they removed and installed insulation." (ECF No. 207 at 3.) However, for the same reasons discussed above with respect to Covil's summary judgment motion, the Court concludes that Witherspoon's testimony is speculative and therefore fails to create a triable issue concerning Mr. Connor's asbestos exposure. (*See supra* at 10–12.) With respect to Plaintiff's testimony, while Plaintiff testified that Mr. Connor's responsibilities took

him to "every part of the plant," (ECF No. 208-3 at 15), as previously discussed, such testimony lacked any information about having observed Mr. Connor around Daniel International employees as they worked with asbestos-containing insulation. Further, when asked whether he ever saw his father in a situation where he believed he "was being exposed to asbestos at the plant," Plaintiff responded: "I don't know that." (*Id.*)

Here again, as with its response to Covil's motion, Plaintiff further relies on the testimony of Gary Albright, Jerry Lee Hicks, and Paul Ogburn. (ECF No. 207 at 4–7.) These individuals testified that asbestos insulation was used at Fiber Industries, and that Daniel International employees were exposed to asbestos as they removed and replaced asbestos insulation causing visible asbestos dust within a few feet of other workers. (*See* ECF No. 208-4 at 9–10; ECF No. 208-5 at 40; ECF No. 208-6 ¶ 23.) However, as discussed above, while this evidence may create a triable issue as to the asbestos exposure of Daniel International employees, the record is devoid of evidence showing that Mr. Connor was present at the time that Daniel International employees were engaged in installing, removing, or replacing asbestos insulation.[9]

Based on the above, the Court finds that Plaintiff has failed to demonstrate that there is a genuine dispute as to Mr. Connor's asbestos exposure, attributable to Daniel International,

---

[9] Daniel International also contends that "[t]he lack of evidence as to whether the insulation contained asbestos is fatal" to Plaintiff's claims. (ECF No. 196 at 11.) However, drawing all reasonable inferences in Plaintiff's favor, the Court concludes that the evidence does establish that at least some of the insulation at Fiber Industries likely contained asbestos. Yet, as discussed above, the evidence is speculative, at best, with respect to whether Mr. Connor was in or around areas in the plant at the time that Daniel International employees were installing, removing, or replacing asbestos-containing insulation.

16

such that a jury could find in favor of Plaintiff. As such, Daniel International is entitled to summary judgment on all claims.

## IV. CONCLUSION

The Court concludes that Plaintiff has failed to introduce evidence of Mr. Connor's exposure to an asbestos-containing product, for which Covil and Daniel International are liable, "over some extended period of time in proximity to where [Mr. Connor] actually worked." *Lohrmann*, 782 F.2d at 1162–63. Plaintiff has thus failed to establish causation as to Covil and Daniel International, each of which are therefore entitled to judgment as a matter of law on all of Plaintiff's claims against them. Accordingly, the two remaining *Daubert* motions, filed by Covil and Daniel International, to exclude the causation testimony of Plaintiff's experts, Edwin Holstein, M.D., Brent Staggs, M.D., and Arnold Brody, Ph.D., (ECF Nos. 201, 202), are denied as moot.

**[ORDER FOLLOWS ON NEXT PAGE]**

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Covil Corporation's Motion for Summary Judgment, (ECF No. 193), is GRANTED.

IT IS FURTHER ORDERED that Daniel International's Motion for Summary Judgment, (ECF No. 195), is GRANTED.

IT IS FURTHER ORDERED that the following two motions are DENIED AS MOOT: *Daubert* Motion of Defendants Daniel International Corporation to Exclude Causation Testimony of Plaintiff's Experts Edwin Holstein, M.D., Brent Staggs, M.D., and Arnold Brody, Ph.D., (ECF No. 201), and Defendants' Joint Motion to Limit or Exclude Causation Testimony of Plaintiff's Experts Edwin Holstein, M.D., Brent Staggs, M.D., and Arnold Brody, Ph.D., (ECF No. 202).

This, the 11th day of December, 2018.

/s/ Loretta C. Biggs
United States District Judge